**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| Ergon Asphalt and Emulsions, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2:13-cv-1683-GMN-NJK |
| vs. | ) | |
| | ) | **ORDER** |
| Capriati Construction Corp, Inc.; Zurich | ) | |
| American Insurance Company; Fidelity and | ) | |
| Deposit Company of Maryland, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Pending before the Court are the Motions for Summary Judgment, (ECF Nos. 41, 45), filed by Plaintiff Ergon Asphalt and Emulsions, Inc. ("Ergon").  Defendants Capriati Construction Corp, Inc., Zurich American Insurance Company, and Fidelity and Deposit Company of Maryland filed Responses in opposition, (ECF Nos. 53, 54), to which Ergon replied, (ECF No. 56).

Also before the Court are Defendants' Motions for Summary Judgment. (ECF Nos. 46, 50).  Ergon filed a Response in opposition, (ECF No. 55), to which Defendants replied, (ECF No. 58).

I.     **BACKGROUND**

This case arises out of a dispute over the payment of escalation costs for an asphalt product sold by Ergon to Defendant Capriati in 2011 and 2012.

On July 9, 2010, Defendant Capriati entered into an agreement with the Nevada Department of Transportation ("NDOT") to furnish work, material, and equipment for the completion of a highway improvement project (the "Project"). (NDOT Contract, ECF No. 23-7).  The Project was intended to improve a stretch of U.S. Highway 95 from Washington

1  Avenue to Kyle Canyon Road in Las Vegas, and was originally anticipated to take 520 days to

2  complete. (*Id.*); (Final Balance Report at 30, ECF No. 41-7).  The agreement between

3  Defendant Capriati and NDOT (the "NDOT Agreement") specified that PG76-22NV, a

4  particular asphalt cement product, would be used in the Project. (NDOT Agreement p. 63, ECF

5  No. 23-7).  The NDOT Agreement also included a price escalation provision which required

6  that NDOT increase its payments to Defendant Capriati if the market price of asphalt cement

7  increased while the Project was ongoing. (*Id.* at 69).  The NDOT Agreement specifically noted

8  that the price escalation provision applied to "PG grades" of asphalt cement. (*Id.* at 214).

9       In October 2010, Ergon and Defendant Capriati began negotiating a deal in which Ergon

10  would supply asphalt for the Project. (Dep. of Golden Welch 23:21-24:4, ECF No. 47-5).  On

11  October 26, 2010, David M. Rocchio, president of Defendant Capriati, executed a credit

12  application (the "Credit Application") which, *inter alia*, set forth terms regarding the extension

13  of credit and timing of payments for anticipated future deliveries of asphalt. (Credit

14  Application, ECF No. 41-1).

15       On October 27, 2010, Ergon sent a one-page confidential price quote (the "Price Quote")

16  to Defendant Capriati, which laid out prices for four different asphalt products, specified that

17  taxes and environmental fees were not included in the listed prices, and contained the phrase

18  "index escalator specifics NDOT." (Price Quote, ECF No. 41-2).  One of the quoted prices was

19  for PG76-22NV. (*Id.*).  The Price Quote also included provisions regarding the timing of

20  orders, the location and duration of the Project, shipping methods, and freight costs. (*Id.*).  The

21  Price Quote did not contain any signature lines or text indicating that a signature was required

22  to give effect to its terms. (*Id.*).

23       On January 10, 2011, Defendant Capriati sent a six-page draft of a purchase agreement

24  (the "Draft Agreement") to Ergon. (ECF No. 41-3).  The Draft Agreement included detailed

25  terms regarding the scope of the work to be completed by Ergon, termination of the agreement,

indemnification, and other aspects of the supply arrangement between Ergon and Defendant Capriati. (*Id.*).   The Draft Agreement did not specify the price of any goods, but instead provided that "[Defendant Capriati] agrees to pay [Ergon] in the payment quantities and schedules as is more fully described in Exhibit 'A': Supplier's Scope of Work." (*Id.* at § 3.1). The Draft Agreement also stated that all applicable taxes had been included in the agreed-upon prices. (*Id.* at § 5.1).   The Draft Agreement also incorporated the terms of the Price Quote, stating:

> The [Draft] Agreement and [Ergon]'s quote, providing said quote is not contrary to this Agreement or all Contract Documents as provided in Section One, comprises the entire Agreement between the parties relating to [Ergon's] furnished materials, and no other agreements, representations, terms, provisions or understandings concerning the Supplier furnished materials have been made.

Unlike the Price Quote, the Draft Agreement did not address whether the prices would be subject to an escalation index.   The last page of the Draft Agreement contained two signature blocks, one designated for Ergon, and the other designated for Defendant Capriati. (*Id.* at p. 5).   Directly above the signature blocks, the Draft Agreement stated, "The parties hereto have executed this Purchase Agreement for themselves, their heirs, executors, successors, administrators, and assignees on the day and year first above written." (*Id.*).

On January 12, 2011, after reviewing the Draft Agreement, Ergon's sales manager, Gregory Hunt, sent an email to Defendant Capriati's contract administrator, Golden Welch, stating that Ergon typically charged a $0.4424/ton environmental fee for PG76-22NV, and indicated that this term should be incorporated into the Draft Agreement. (Gregory Hunt Email, ECF No. 48-4).   Over the next day, Mr. Hunt and Mr. Welch exchanged several emails regarding proposed changes to the Draft Agreement. (Hunt-Welch Email Thread, ECF No. 48-5).   On January 18, 2011, Mr. Welch sent an email to Mr. Hunt asking, "Is Ergon going to sign our Purchase Agreement?" (*Id.*).   Mr. Hunt responded the same day, stating "Yes, I will get it

to you tomorrow." (*Id.*).  However, there is no evidence on the record demonstrating that any agent of Ergon or Defendant Capriati ever signed the Draft Agreement.

In the midst of these negotiations, Ergon began delivering PG76-22NV, which was accepted by Defendant Capriati.  The records of both of these parties reflect that Ergon sold 40.73 tons of the product to Defendant Capriati on January 13, five days before Mr. Welch's email inquiring as to whether Ergon would sign the revised Draft Agreement. (Capriati Account Summary p. 94, ECF No. 23-3); (Ergon Account Summary p. 695, ECF No. 23-4). Ergon continued to make deliveries of PG76-22NV until the Project concluded in November 2012. (Capriati Account Summary p. 104).

On May 2, 2012, Mr. Hunt sent Mr. Welch an email stating, in full, "Here is a revised escalator increase.  I have also included our contract for you to view.  Let me know what questions you might have.  Thank you!" (Gregory Hunt Email, ECF No. 41-5).  Attached to the email was a revised version of the Price Quote, which, with the exception of a single line that stated "Escalator passed to Ergon," was identical to the original. (Revised Price Quote, ECF No. 41-6).  There is no evidence on the record indicating that Defendant Capriati objected to the characterization of the Price Quote as the "contract" or to the additional text in the Revised Price Quote at that time.

Between June 2012 and November 2012, Ergon submitted five invoices to Defendant Capriati requesting escalation payments, calculated pursuant to NDOT's formula, in the total amount of $288,406.92. (Ergon Invoices, ECF Nos. 41-8, 41-11).  Defendant Capriati paid the first of these, in the amount of $63,505.01, on October 12, 2012.  The other four invoices were initialed and stamped as approved by Defendant Capriati on December 28, 2012, but Defendant Capriati subsequently refused to issue the corresponding payments, (Approved Invoices, ECF No. 41-10), asserting that the Draft Agreement did not require payments for escalation. However, it is undisputed that Defendant Capriati received $401,041 from NDOT during the

course of the Project as compensation for "asphalt escalation." (NDOT Balance Report p. 23, ECF No. 41-7).

Seeking to recover the unpaid asphalt escalation balance, Ergon filed its Complaint on September 13, 2013, setting forth claims against Defendant Capriati for: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; and (3) unjust enrichment. (Compl., ECF No. 1).  Ergon also asserted a claim against Defendants Zurich and Fidelity as sureties of Defendant Capriati's labor and material bond. (*Id.*).

In response, Defendant Capriati asserted counterclaims against Ergon for: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) unjust enrichment; and (4) deceptive trade practices. (Answer, ECF No. 14).

In its Motions, Ergon requests that summary judgment be entered in its favor as to all pending claims.  Defendants, in their Motions, request the entry of summary judgment as to all claims except Defendant Capriati's claim for deceptive trade practices.

## II.   LEGAL STANDARD

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103-04 (9th Cir. 1999)).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported

1    claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

2        In determining summary judgment, a court applies a burden-shifting analysis.  "When

3    the party moving for summary judgment would bear the burden of proof at trial, it must come

4    forward with evidence which would entitle it to a directed verdict if the evidence went

5    uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing

6    the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp.*

7    *Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

8        In contrast, when the nonmoving party bears the burden of proving the claim or defense,

9    the moving party can meet its burden in two ways: (1) by presenting evidence to negate an

10   essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

11   party failed to make a showing sufficient to establish an element essential to that party's case

12   on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323-

13   24.  If the moving party fails to meet its initial burden, summary judgment must be denied and

14   the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*,

15   398 U.S. 144, 159-60 (1970).

16       If the moving party satisfies its initial burden, the burden then shifts to the opposing

17   party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v.*

18   *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute,

19   the opposing party need not establish a material issue of fact conclusively in its favor.  It is

20   sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

21   parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

22   *Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid

23   summary judgment by relying solely on conclusory allegations that are unsupported by factual

24   data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go

25   beyond the assertions and allegations of the pleadings and set forth specific facts by producing

competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249-50.

## III.   <u>DISCUSSION</u>

This dispute centers upon whether a valid contract existed between Ergon and Defendant Capriati, and, if so, whether that contract required escalation payments.  Defendants argue that the Draft Agreement constitutes a binding contract which does not provide for escalation payments.  Ergon asserts that the Credit Application and Price Quote together constitute a legally binding agreement requiring that Defendant Capriati make escalation payments. Alternatively, Ergon argues that Defendant Capriati was unjustly enriched by receiving escalation payments from NDOT without actually bearing the risk of a rise in asphalt prices.

In considering the instant Motions, the Court will first address whether parties are bound by the Draft Agreement.  The Court will then assess whether the Credit Application and Price Quote collectively constitute a binding contract.  Finally, the Court will analyze the merits of the parties' claims for unjust enrichment.

### A.   *The Draft Agreement*

Pursuant to Nevada law, a valid contract requires: (1) an offer and acceptance, (2) a meeting of the minds, and (3) consideration. *See, e.g.*, *May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005).  In regard to the first criterion, a party may accept an offer by "any reasonable manner" unless specific language or conduct indicates that a particular manner of acceptance is required. *Jim L. Shetakis Distrib. Co. v. Centel Commc'ns Co.*, 756 P.2d 1186, 1188 (Nev. 1988).  Indeed, "where the circumstances indicate that a particular manner of contract

1    formation is contemplated by the parties, a binding contract is not formed in the absence of

2    compliance with the contemplated procedure." *Id.* (citing *Widett v. Bond Estate, Inc.*, 382 P.2d

3    212 (Nev. 1963).

4          Numerous courts have held that if a written agreement indicates that a signature is

5    required for acceptance, its terms are not binding unless the offeree actually provides a

6    signature. *Leodori v. CIGNA Corp*., 814 A.2d 1098, 1107 (N.J. 2003) ("Defendant's own

7    documents contemplated plaintiff's signature as a concrete manifestation of his assent. . . . Our

8    contract law does not permit defendant to contemplate or require plaintiff's signature on an

9    agreement and then successfully to assert that the omission of that signature is irrelevant to the

10   agreement's validity."); *Open Solutions Inc. v. Granite Credit Union*, No. 3:12-CV-1353-RNC,

11   2013 WL 5435105, at *2 (D. Conn. Sept. 29, 2013) ("On the last page of the Agreement, it

12   states, "ACCEPTED AND AGREED TO BY OPEN SOLUTIONS, INC.," above a blank space

13   for OSI's signature.  Had it been the intent of the parties to not require OSI's signature, this

14   section likely would not have been included." (internal citation omitted)); *Pacific Photocopy,*

15   *Inc. v. Canon U. S. A., Inc.*, 646 P.2d 647, 649-50 (Or. Ct. App. 1982) ("The document was

16   written and contained a signature line for approval by defendant.  Even though paragraph 23

17   does not specifically require a signature of defendant's authorized agent, it appears from the

18   character and form of the document that the parties contemplated signatures by both parties to

19   complete the agreement.")

20         In this case, it is apparent both from the Draft Agreement's text and from Defendant

21   Capriati's conduct that Ergon's signature was required for acceptance.  The last page of the

22   Draft Agreement contains signature blocks for Ergon and Defendant Capriati, preceded by the

23   statement, "The parties hereto have executed this Purchase Agreement for themselves, their

24   heirs, executors, successors, administrators, and assignees on the day and year first above

25   / / /

1  written."[1] (Draft Agreement p. 15, ECF No. 41-3).  Furthermore, following several days of

2  negotiations regarding the Draft Agreement, Defendant Capriati's agent, Golden Welch,

3  specifically asked, "Is Ergon going to *sign* our purchase agreement?" (Hunt-Welch Email

4  Thread, ECF No. 48-5) (emphasis added).  Therefore, both the text and Defendant Capriati's

5  related communications clearly illustrate that Defendant Capriati contemplated that a signature

6  was required for Ergon to accept the terms of the Draft Agreement.  As it is undisputed that

7  Ergon never signed the document, the Court finds that the Draft Agreement does not constitute

8  a binding contract.

9       Alternatively, Defendant Capriati argues that the terms of the Draft Agreement should

10  be given effect pursuant to the doctrine of promissory estoppel.  However, promissory estoppel

11  may only be applied as a substitute for consideration or as an exception to the statute of frauds,

12  and cannot not act as a substitute for an actual agreement. *See, e.g.*, *Bartello v. CitiMortgage,*

13  *Inc.*, No. 2:13-CV-1891-GMN-VCF, 2014 WL 1514174, at *5 (D. Nev. Apr. 16, 2014).

14  Defendant Capriati ignores this limitation, arguing that promissory estoppel could be applied to

15  nullify the Draft Agreement's signature requirement.  However, as Defendant Capriati fails to

16  cite any prior case in which the doctrine of promissory estoppel was applied to nullify a

17  specific manner of acceptance contemplated within an agreement, and the Court is unable to

18  identify any such authority, the Court finds Defendant Capriati's argument unavailing.[2]

19       B.    *The Credit Application and Price Quote*

20       Ergon argues that the Credit Application and Price Quote constitute a binding

21  _____

22  [1] As relevant here, Black's Law Dictionary defines "execute" as "[t]o make (a legal document) valid by signing;
   to bring (a legal document) into its final, legally enforceable form." EXECUTE, Black's Law Dictionary (10th

23  ed. 2014).

24  [2] Nevertheless, even if the requirement of a specific manner of acceptance could be nullified through promissory
   estoppel, Defendant Capriati has failed to show that it was harmed as a result of reasonable reliance upon

25  Ergon's conduct.  The fact that Defendant Capriati began accepting deliveries of PG76-22NV five days *before*
   Mr. Hunt indicated that he would sign the Draft Agreement belies the assertion that Defendant Capriati relied on
   the statement in conducting its business with Ergon.

agreement.  It is undisputed that Mr. Rocchio, Defendant Capriati's president, executed the Credit Application on October 26, 2010. (Credit Application, ECF No. 41-1).  However, the Credit Agreement does not address asphalt products or prices, nor does it contain any provisions regarding escalation.  Furthermore, Ergon does not allege that Defendant Capriati violated any terms of the Credit Agreement.  Therefore, while it appears that the Credit Agreement constitutes a valid contract between Ergon and Defendant Capriati, this agreement bears no relevance to the instant dispute.

Though the parties are likely bound by the Credit Agreement, the same cannot be said of the Price Quote.  It is a thoroughly established principle of contract law that "a counteroffer that deviates from the terms of an offer ordinarily operates as a rejection of the offer so as to terminate the offer immediately." *Martinez v. Brownco Const. Co.*, 301 P.3d 1167, 1170 (Cal. 2013).  There is no evidence in the record to suggest that Defendant Capriati unconditionally accepted the terms of the Price Quote after it was transmitted on October 27, 2010.  Quite the contrary, instead of accepting the terms of the Price Quote, Defendant Capriati counteroffered by sending the Draft Agreement to Ergon on January 10, 2011.  Thus, even if the Price Quote constituted an offer, that offer was terminated at the moment Defendant Capriati sent the Draft Agreement.

As the parties have failed to show that either the Draft Agreement or the Price Quote constitute a binding contract, the Court finds that both Ergon's and Defendant Capriati's claims for breach of contract fail as a matter of law.  Concordantly, as both parties' claims for breach of the covenant of good faith and fair dealing presuppose the existence of a valid contract, these claims also fail.

C.   *Unjust Enrichment*

"In Nevada, the elements of an unjust enrichment claim or 'quasi contract' are: (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation of the benefit by the

1    defendant; and (3) acceptance and retention of the benefit by the defendant (4) in circumstances

2    where it would be inequitable to retain the benefit without payment." *WMCV Phase 3, LLC v.*

3    *Shushok & McCoy, Inc.*, 750 F. Supp. 2d 1180, 1196 (D. Nev. 2010) (citing *Leasepartners*

4    *Corp., Inc. v. Robert L. Brooks Trust*, 942 P.2d 182, 187 (Nev. 1997)).   However, a plaintiff

5    need not have directly conferred the benefit upon the defendant to recover under a claim of

6    unjust enrichment, so long as the benefit was conferred as a result of the plaintiff's actions. *Id.*

7    (citing *Topaz Mut. Co., Inc. v. Marsh*, 839 P.2d 606, 613 (Nev. 1992)).

8         The undisputed facts in this case clearly demonstrate that the first three elements are

9    satisfied as to Ergon's unjust enrichment claim.[3]   The parties do not dispute that, due to the

10   increase of PG76-22NV's price during the course of the Project, Defendant Capriati received

11   over $224,901.91 in escalation payments from NDOT that were not passed on to Ergon.

12   (NDOT Balance Report p. 23, ECF No. 41-7).   Nor does Defendant Capriati deny that it has

13   retained and appreciated these payments.   However, Defendant Capriati does argue that it

14   would not be inequitable for the Court to allow it to continue to retain the escalation payments.

15        Defendant Capriati cites *Korea Life Insurance Company v. Morgan Guaranty Trust*

16   *Company of New York*, 269 F. Supp. 2d 424 (S.D.N.Y. 2003), in support of its assertion that

17   principles of equity weigh in its favor.   In *Morgan*, the court held that, under New York law, no

18   liability may exist under a theory of unjust enrichment when a party incurs an additional cost

19   due to a risk that was known at the time a contract was formed. 269 F. Supp. 2d at 447.

20   However, this holding is inapplicable to the instant case because, as discussed *supra*, Ergon and

21   Defendant Capriati never entered a binding agreement governing the sale of PG76-22NV.

22   _____

23   [3] Citing *Las Vegas Fetish & Fantasy Halloween Ball, Inc. v. Ahern Rentals, Inc.*, 182 P.3d 764 (Nev. 2008),
     Defendant Capriati argues that Mr. Hunt's ultimately incorrect representations that Ergon would sign the Draft
24   Agreement amount to "unclean hands" which prohibit Ergon from recovering under a theory of unjust
     enrichment.   However, Defendant Capriati fails to provide any evidence showing that these representations were
25   made in bad faith, and it is clear from the record that Ergon was not obligated to sign the Draft Agreement.
     Therefore, the facts of this case do not warrant a finding that Ergon should be prohibited from recovering as a
     result of "unclean hands."

1    Instead, the Court finds *Asphalt Products Corporation v. All Star Ready Mix, Inc.*, 898

2  P.2d 699 (Nev. 1995), particularly relevant to the case at bar.  *All Star* involved a dispute

3  between a concrete mixing company and an equipment seller. 898 P.2d at 700.  Though the

4  parties never executed a written agreement, the mixing company issued a letter communicating

5  its intent to purchase a tractor from the seller once it obtained financing, to which the seller

6  responded by delivering the tractor to the mixing company. *Id.*  The mixing company used the

7  tractor for ten weeks, but was ultimately unable to obtain financing. *Id.*  As a result, the seller

8  repossessed the tractor. *Id.*  In regard to the seller's unjust enrichment claim, the Nevada

9  Supreme Court held that the mixing company was liable for the fair cost of renting the tractor

10  for ten weeks, because it had obtained a benefit from its use of the tractor without

11  compensating the seller. *Id.* at 702.

12    In the instant case, just as in *All Star*, there is no written agreement governing the

13  transaction between the parties.  Just as the mixing company in *All Star* benefitted from the use

14  of the ultimately repossessed tractor, Defendant Capriati received significant compensation

15  from NDOT for market risks that were actually borne by Ergon.  Concordantly, just as the

16  seller in *All Star* was entitled to compensation for the mixing company's use of the tractor,

17  Ergon is entitled to the funds obtained by NDOT based on the increase in asphalt prices that

18  occurred while the Project was ongoing.  Therefore, the Court will grant summary judgment in

19  favor of Ergon as to the unjust enrichment claims.[4]  As the parties do not dispute Ergon's

20  calculation of escalation prices pursuant to NDOT's formula, the Court will enter judgment in

21  favor of Ergon in the amount of $224,901.91.

22    Furthermore, because it is undisputed that Defendants Zurich and Fidelity should be held

23

24  ───────────────────

25  [4] Because the Court finds that it would be inequitable for Defendant Capriati to retain the escalation payments, Defendant Capriati's unjust enrichment claim, which seeks recovery for the $63,505.01 already paid for escalation, fails as a matter of law.  Similarly, Defendant Capriati's deceptive trade practices claim also fails, as it is premised upon the assertion that Ergon was not entitled to escalation payments.

liable as sureties based on Defendant Capriati's failure to pay for labor and materials related to the Project, *see* (Labor and Material Bond, ECF No. 7), the Court will grant summary judgment in favor of Ergon as to the claim against bond.  Accordingly, Defendants Zurich and Fidelity will be held jointly and severally liable pursuant to the judgment against Defendant Capriati.

**IV.    CONCLUSION**

**IT IS HEREBY ORDERED** that Ergon's Motion for Summary Judgment, (ECF No. 41), is **GRANTED as to Ergon's unjust enrichment claim and Ergon's claim against bond.**

**IT IS FURTHER ORDERED** that Ergon's Motion for Summary Judgment as to Defendants' Counterclaims, (ECF No. 45), is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment, (ECF No. 46), is **GRANTED as to Ergon's Claims for breach of contract and breach of the covenant of good faith and fair dealing.**

**IT IS FURTHER ORDERED** that Defendant Capriati's Motion for Summary Judgment as to its Counterclaims, (ECF No. 50), is **DENIED**.

**IT IS FURTHER ORDERED** that judgment be entered in the amount of $224,901.91 in favor of Ergon and against Defendants Capriati, Zurich, and Fidelity, jointly and severally. The Clerk is instructed to close the case.

**DATED** this 29th day of April, 2015.

_____
Gloria M. Navarro, Chief Judge
United States District Court